IN THE TEXAS COURT OF CRIMINAL APPEALS

CAUSE NO. 74,900

AND

IN THE 182ND JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

```
* * * * * * * * * * * *
                      *
EX PARTE             *
                      *
TOMAS RAUL GALLO,    *          Case No. 940093
                      *
          Applicant  *
                      *
* * * * * * * * * * * *
```

THIS IS A DEATH PENALTY CASE

APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

# APPENDIX

FILED IN THE 182ND JUDICIAL DISTRICT COURT OF HARRIS, COUNTY

ON BEHALF OF APPLICANT BY:

Stephen Morris
Attorney at Law
6430 FM 1960 West, No. 165
Houston, Texas 77069
TBN. 14501700

Writ Counsel for Tomas Raul Gallo

# APPENDIX A.



# JUDGMENT – DEATH PENALTY

CAUSE NO. _940093_

THE STATE OF TEXAS
VS.

_TOMASA GALUO_ (PAUL)
(Name of Defendant)

IN THE _182nd_ DISTRICT COURT

OF HARRIS COUNTY, TEXAS

AKA _____

Date of Judgment: _02/18/04_

Date of Offense: _12/11/01_

Attorney for State: _LANCE LONG / CRAIG GOODHART_

Attorney for Defendant: _Robert Morrow / Gerald Bourque_   ☐ Defendant Waived Counsel

Offense Convicted of:

_CAPITAL MURDER_

A FELONY. DEGREE: CAPITAL

(Circle appropriate selection – N/A = not available or not applicable)

Plea to Enhancement Paragraph(s):   ⎯1st Paragraph⎯   True | Not True **(N/A)**   ⎯2nd Paragraph⎯   True | Not True **(N/A)**   ⎯Charging⎯ Instrument: Indictment

Findings on Enhancement(s):   1st Paragraph   True | Not True **(N/A)**   2nd Paragraph   True | Not True **(N/A)**   Plea: Not Guilty

This cause being called for trial, in Harris County, Texas, unless otherwise referenced, the State appeared by her District Attorney as named above and the Defendant named above appeared in person with Counsel as named above; or the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel as indicated above in writing in open court, and both parties announced ready for trial.

A Jury composed of _UNA FaaaFaaaa_ and eleven others was selected, impaneled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea of not guilty thereto, after having heard the evidence submitted; and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and having heard argument of counsels, the Jury retired in charge of the proper officer and returned into open Court on _02/11/04_, the following verdict, which was received by the Court and is here entered on record upon the minutes:

_WE, the JURY, FIND the DEFENDANT, TOMAS RAUL GALUO, guilty of CAPITAL Murder, as charged in the Indictment._

_1st DAMION PHILLIPS_

Thereupon, the Jury, in accordance with law, heard further evidence in consideration of punishment, and having been again charged by the Court, the jury retired in charge of the proper officer in consideration of punishment and returned in open Court on _02/18/04_, the following verdict, which was received by the Court and is here entered of record upon the minutes:

(Special Issues/Verdict/Certification):

_SEE ATTACHED_



EXHIBIT
1

_4/JM/999 ___ 001451_



(Special Issues – Continued):

It is therefore considered, ordered, and adjudged by the Court that the Defendant is guilty of the offense indicated above, a felony, as found by the verdict of the Jury, and that the said Defendant committed the said offense on the date indicated above, and that he be punished as has been determined by the Jury, by death, and that Defendant be remanded to jail to await further orders of this Court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence against him as follows, to wit, "It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense indicated above and whose punishment has been assessed by the verdict of the Jury and the judgment of the Court at Death, shall be delivered by the Sheriff of Harris County, Texas immediately to the Director of the Institutional Division, Texas Department of Criminal Justice or any other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas. The said Defendant is remanded to jail until said Sheriff can obey the directions of this sentence. From which sentence an appeal is taken as a matter of law to the Court of Criminal Appeals of the State of Texas.

2/18/03
JUSTICE OF APPEAL FILE

Signed and entered on _____ 02/18/04

X _____

Hon JEANNINE BARR
JUDGE PRESIDING

GALLO

074c ZU P0179

GC1451-A

# APPENDIX B.

NO. 74,900

IN THE COURT OF CRIMINAL APPEALS

FOR THE STATE OF TEXAS

AT AUSTIN

**TOMAS RAUL GALLO,**
*Appellant*

*v.*

**THE STATE OF TEXAS**
*Appellee*

---

**APPELLANT'S BRIEF**

---

On Appeal in Cause No.940093  from the
182nd Judicial District Court of Harris County, Texas

---

**ROBERT MORROW**
Hocker, Morrow & Sterling
State Bar No. 14542600
6630 Cypresswood Dr Ste 200
Spring, TX, 77379-7721
(281) 379-6901
Appointed on Appeal
*Of Counsel*
JANI J. MASELLI
State Bar No. 00791195
808 Travis St., 24th Floor
Houston, TX 77002
(713) 757-0684

Attorneys for Appellant,
**TOMAS RAUL GALLO**

**[APPELLANT REQUESTS ORAL ARGUMENT]**



# LIST OF PARTIES

Pursuant to *Tex. R. App. Proc. 38.1*(a), Appellant presents the following list of parties and counsel:

| | |
|---|---|
| Mr. Tomas Gallo | Appellant - TDCJ-ID, Death Row Inmate |
| Ms. Destiny Flores | Deceased Complainant |
| Mr. Charles Rosenthal<br>Mr. Lance Long<br>Mr. Craig Goodhart | Harris County District Attorney<br>Prosecutors at Trial<br>Harris County District Attorney's Office<br>1201 Franklin, 6th Floor<br>Houston, TX 77002 |
| Mr. Robert Morrow<br>Mr. Gerald Bourque | Defense Counsel at Trial and Direct Appeal*<br>Defense Counsel at Trial<br>6630 Cypresswood, Suite 200<br>Spring, TX 77379 |
| Hon. Jeannine Barr | Presiding Judge<br>182nd District Court<br>1201 Franklin<br>Houston, TX 77002 |

# TABLE OF CONTENTS

**PAGE**

NAMES OF ALL PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

POINTS OF ERROR  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

POINTS OF ERROR

    1.    The Evidence Is Legally and Factually Insufficient to Support the Jury's Determination That Appellant Is Not Mentally Retarded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    2.    The Trial Court Erred by Not Granting a Mistrial When *ex Parte Briseno* Was Handed down by the Texas Court of Criminal Appeals in the Middle of Trial, Prejudicing Appellant's Presentation of the Mental Retardation Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    3.    The Trial Court Erred by Rejecting Appellant's Proposed Instructions Regarding Mental Retardation, Especially in Light of *ex Parte Briseno*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    4.    The Trial Court Erred in Denying Appellant's Requested Charge for Instructions Directing the Jury to Disregard His Statement If They Determine That His Mental Impairment Prevented Him from Understanding His Miranda Rights and Executing an Understanding, Intelligent Waiver of Rights.  . . . . . . . . . 50

5.     The Trial Court Erred by Denying the Motion to Suppress Gruesome Photographs Admitting into Evidence over Proper Objection, Numerous, Repetitious Gruesome Photographs of the Dead Complainant, a Three Year Old Child in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

6.     The Trial Court Erred in Refusing to Grant a Continuance When the State Brought Forth a Surprise Witness Who Stated Appellant Confessed to the Crime and That Appellant Confessed He Was Faking His Mental Retardation in Violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7.     The Trial Court Erred in Not Allowing in the Testimony of Defense Expert Dr. Holden, Regarding the Issue of Filicide in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

8.     The State Purposefully Attacked Appellant over the Shoulders of Defense Counsel and Subjected Appellant to Epitaphs Unworthy of Courtroom Decorum and in Violation of the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

9.     The Trial Court Erred in Refusing to Allow the Defense to Present Testimony from Appellant's Family about the Impact His Execution Would Have on the Family, in Violation of Appellant's Eighth Amendment and Due Process Rights. . . . . . . . . . . . . 74

10.    The Trial Court Erred in Denying the Defense Request for an Instruction Allowing the Jurors to Consider Any Residual Doubt as a Mitigating Circumstance When Answering the Mitigation Special Isue and the Continuing Threat Special Isse, Depriving Appellant of His Right to Lace All Mitigating Evidence, Including the "Circumstances of the Offense" Within the Jury's Effective Reach in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. . . . . . . . . . . . 81

11.   The Trial Court Erred by Refusing Appellant's Request to Give the Closing Argument at Punishment on the Mitigation Special Issue in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. ................................ 88

12.   The Trial Court Erred in Denying the Motion to Preclude the Death Penalty as a Sentencing Option Or, in the Alternative Quash the Indictment - *Apprendi/Bush v. Gore* in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. ............................................... 92

13.   The Trial Court Erred in Denying Appellant's Motion to Preclude the Use of the Death Penalty (Pancuronium Bromide) in Violation of the Eighth and Fourteenth Amendments to the United States Constitution. ................................ 94

PRAYER FOR RELIEF ............................................. 97

CERTIFICATE OF SERVICE ........................................ 98

iv

# INDEX OF AUTHORITIES

## CASES

*Atkins v. Virginia*, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Bailey v. Com.*, 2006 WL 1649322(Ky.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Blonner v. State*, 127 P.3d 1135 (Okla. Crim. App. 2006). . . . . . . . . . . . . . . . 47, 48, 49

*Bray v. State*, 478 S.W.2d 89 (Tex.Crim.App.1972) . . . . . . . . . . . . . . . . . . . . . 69, 70

*Burnett v. State*, 959 S.W.2d 652 (Tex.App .–Houston [1st Dist.] 1997) . . . . . . . . . . . 89

*Bush v. Gore*, 121 S.Ct. 525 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, *93*

*Cain v. State*, 958 S.W.2d 404 (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . 34

*California v. Brown*, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Clark v. Procunier*, 755 F.2d 394 (5th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996). . . . . . . . . . . . . . . . . . . 35, *36*

*Coble v. State*, 871 S.W.2d 192 (Tex.Crim.App.1993) . . . . . . . . . . . . . . . . . . . . . . 68

*Colella v. State*, 915 S.W.2d 834 (Tex.Crim.App. 1995) . . . . . . . . . . . . . . . . . . . . . 91

*Corbitt v. New Jersey*, 439 U.S. 212 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Cosby v. Jones*, 682 F.2d 1373 (11th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Daubert v. Merrell Dow Pharm.*,509 U.S. 579, 113 S.Ct. 2786 (1993) . . . . . . . . . . . 64

*Denton v. State*, 920 S.W.2d 311 (Tex.Crim.App.1996) . . . . . . . . . . . . . . . . . . . . . 71

*Dinkins v. State*, 894 S.W.2d 330 (Tex.Crim.App.1995) . . . . . . . . . . . . . . . . . . . . . 69

*Drew v. State*, 743 S.W.2d 207 (Tex.Crim.App.1987) . . . . . . . . . . . . . . . . . . . . . . . 69

*Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869 (1982) . . . . . . . . . . . . . . . . . . . . . 82

*Ex parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . 41, 42

*Ex parte Elizalde,* 2006 WL 235036 (Tex.Crim.App.) . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320 (1988) . . . . . . . . . . . . . . . 82, 83, 84

*Fuentes v. State,* 664 S.W.2d 333 (Tex.Crim.App. 1984) . . . . . . . . . . . . . . . . . . . . . . 68

*Garcia v. State,* 901 S.W.2d 724 (Tex.App.–Houston [14ᵗʰ Dist.] 1995, *pet ref'd).* . . . 89

*Gilmore v. Taylor,* 508 U.S. 333, 113 S.Ct. 2112 (1993) . . . . . . . . . . . . . . . . . . . . . . 66

*Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457 (1942) . . . . . . . . . . . . . . . . . . . . . 33

*Graue v. State,* 783 S.W.2d 322 (Tex. App. – San Antonio, 1991) . . . . . . . . . . . . . . 69

*Gregg v. Georgia,* 428 U.S. 153 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 84, 93

*Heiney v. Florida,* 469 U.S. 920, 105 S.Ct. 303 (1984) . . . . . . . . . . . . . . . . . . . . 84, 85

*Hill v. McDonough* 2006 WL 1584710 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 96

*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781 (1979) . . . . . . . . . . . . . . . . . . . . . . 33

*Janecka v. State,* 937 S.W.2d 456 (Tex.Crim.App.1996) . . . . . . . . . . . . . . . . . . . . . . 60

*Johnson v. State,* 23 S.W.3d 1 (Tex.Crim.App. 2000). . . . . . . . . . . . . . . . . . . . . . 35, 36

*Jones v. State,* 522 S.W.2d 470, 474 (Tex.Crim. App. 1975) . . . . . . . . . . . . . . . . 51, 52

*Jones v. State,* 944 S.W.2d 642 (Tex.Crim.App.1996) . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kincaid v. State,* 534 S.W.2d 340 (Tex.Crim.App.1976) . . . . . . . . . . . . . . . . . . . . . . 70

*Knoeppel v. State,* 382 S.W.2d 493 (Tex.Crim.App. 1964). . . . . . . . . . . . . . . . . . . . . 90

*Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 82

vi

*Martinez v. State*, 501 S.W.2d 130 (Tex.Crim.App. 1973) ...................... 90

*Meraz v. State*, 785 S.W.2d 146 (Tex.Crim.App.1990) ..................... 34, *36*

*Miller v. State*, 36 S.W.3d 503 (Tex. Crim. App. 2001) ...................... 66

*Mireles v. State*, 994 S.W.2d 148 (Tex.Crim.App.1999) ...................... 34

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991). ................... 66

*Mosley v. State,* 983 S.W.2d 249 (Tex. Crim. App. 1998) ..................... 67, 68

*Nenno v. State*, 970 S.W.2d 549 (Tex.Crim.App.1998). ........................ 64

*Orona v. State,* 791 S.W.2d 125 (Tex.Crim.App.1990) ......................... 71

*Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597 (1991) ................... 75-79

*Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934 (1989) ................... 86, 87

*Pool v. Ford Motor Company*, 715 S.W.2d 629 (Tex.1986). ..................... 36

*Prible v. State*, 175 S.W.3d 724 (Tex.Crim. App. 2005) ..................... 55-58

*Rayford v. State*, 125 S.W.3d 521 (Tex. Crim. App. 2001) ..................... 93

*Reese v. State*, 33 S.W.3d 238 (Tex. Crim. App. 2000). ................... 54, 55, 58

*Rogers v. State*, 549 S.W. 2d 726 (Tex. Crim. App. 1977). .................... 51

*Roise v. State*, 7 S.W.3d 225 (Tex.App.-Austin 1999, pet. ref'd). ................ 64

*Ruedas v. State*, 586 S.W.2d 520 (Tex.Crim.App. 1979) ...................... 90

*State v. Hartman,* 42 S.W.3d 44 (TN 2001) ............................ 85, 86

*State v. Teague*, 897 S.W.2d 248 (TN 1995) ........................... 85, 86

*Stewart v. State*, 129 S.W.3d 93 (Tex. Crim. App. 2004) ..................... 66

*Stone v. State*, 823 S.W.2d 375 (Tex.App. – Austin, 1992, pet. ref'd) . . . . . . . . . . 34, 35

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984) . . . . . . . . . . . . . . . 61

*Summers v. State,* 147 Tex.Crim. 519, 182 S.W.2d 720 (1944) . . . . . . . . . . . . . . . . . 68

*United States v. Casilla*, 20 F.3d 600 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984) . . . . . . . . . . . . . . . . . . 61

*United States v. Davis*, 132 F.Supp.2d 455 (E.D. La. 2001) . . . . . . . . . . . . . . 83, 84, 85

*United States v. Jaramillo*, 42 F.3d 920 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Menesses*, 962 F.2d 420 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Ornelas-Rodriguez*, 12 F.3d 1339 (5th Cir. 1994). . . . . . . . . . . . . . . . 33

*United States v. Sanchez*, 961 F.2d 1169 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 33, 34

*United States v. Velgar-Vivero*, 8 F.3d 236 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . . 33

*Vodochodsky v. State*, 158 S.W.3d 502 (Tex.Crim.App. 2005) . . . . . . . . . . . . . . . 37, 38

*Wallace v. State,* 467 S.W.2d 608 (Tex.Crim.App.1971). . . . . . . . . . . . . . . . . . . . 69, 70

*Weatherred v. State*, 15 S.W.3d 540 (Tex.Crim.App.2000) . . . . . . . . . . . . . . . . . 64, 65

*Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . 68, 70-73

*Zuniga v. State*, 144 S.W.3d 477 (Tex.Crim.App. 2004) . . . . . . . . . . . . . . . . . . . . . . 34

# CONSTITUTIONS, STATUTES, & TREATISES

*U.S. Const. Amend. VI.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Tex. Const. Art. V § 6* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Tex.Code Crim. Proc. Ann. art. 29.03.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Texas Code Crim. Proc. art. 36.07* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Texas Code Crim. Proc. art. 37.071* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Texas Code Crim. Proc. 37.071 § 2(c)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Texas Code Crim. Proc. art. Art. 37.071(h)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Texas Code Crim. Proc. art. 46B.022* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Texas Rule Evid. 702* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

*Tex.R.Civ.P., Rule 269.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

2 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal § 702.3* (Supp.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

McCormick, *Handbook of the Law of Evidence*, §§ 185, p. 436 (2d ed. 1972). . . . . . . 66

Peggy M. Tobolowsky, *Texas and the Mentally Retarded Capital Offender*, 30 T. Marshall L. Rev. 39, 115-16 (Fall 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

William S. Geimer and Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in 10 Florida Death Penalty Cases*, 15 AM. J. CRIM. L. 1, 28 (1988)   . . . 81, 82

NO. 74,900

IN THE COURT OF CRIMINAL APPEALS

FOR THE STATE OF TEXAS

AT AUSTIN

\*  \*  \*

**TOMAS RAUL GALLO**

*Appellant*

*v.*

**THE STATE OF TEXAS,**

*Appellee*

\*  \*  \*

---

### APPELLANT'S BRIEF

---

On Appeal in Cause No. 940,093 from the
182nd Judicial District Court of Harris County, Texas

---

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

NOW COMES, TOMAS RAUL GALLO, Appellant in this capital murder appeal, by

and through his counsel ROBERT MORROW, appointed on appeal only, and files this his

Appellant's Brief.  He would respectfully show the Court as follows:

1

## PRELIMINARY STATEMENT

This is an automatic appeal from Appellant's capital murder conviction and death sentence. *Art. 37.071(h), V.A.C.C.P.* In a complaint filed December 12, 2001, Appellant was charged with capital murder: that on December 11, 2001, he did then and there unlawfully, intentionally, and knowingly cause the death of Destiny Flores, hereinafter called the Complainant, an individual under six years of age, by striking the complainant with the defendant's hand. (C.R.I - 2).[1] Appellant was arrested on December 12, 2001, and given his magistrate's warnings and held without bond. (C.R.I - 3) Appellant was indicted and tried for the offense in 2002, however, a mistrial was granted on January 2, 2003. (CR II - 379). The grand jury re-indicted Appellant for the offense on February 20, 2003. (CR I - 1).[2]

Appellant was represented by appointed counsel and entered his plea of not guilty to the charge of capital murder. The jury found Appellant guilty of capital murder as charged in the indictment. (C.R.IV - 790). Following the separate punishment hearing the court submitted both special issues and the jury answered the two statutory special issues "Yes" and "No". The trial court imposed the mandatory sentence of death. (C.R.IV - 790).

There was no motion for new trial. Undersigned counsel represented Appellant at trial and on appeal as appointed counsel.

---

[1]     The Clerk's Record refers to the Clerk's Record titled"Supplemental Record to Correct Objections filed August 23, 2005," with four volumes.

[2]     All motions from the original cause number and trial were transferred to the instant case. (R.R. 36 - 5-6; R.R. 52 - 130-131).

## OVERVIEW OF EVIDENCE

*Introduction*

Appellant was convicted of the capital murder of Destiny Flores, a three year old child. The evidence established Appellant suffers from mental retardation, and the trial court rejected several defense motions which would have ensured a fair trial for Appellant.

*Guilt/Innocence*

Cristina Arredondo Gutierrez, the complainant's mother testified she met Appellant in April or May of 2001. (R.R. 54 - 91). While living with Appellant at her sister's house, he would watch her two daughters while she worked. (R.R. 54 - 98-100). The night before December 11, 2001, when Cristina wanted to go to bed, she stated Appellant wanted her to stay up and play Play Station with him. (R.R. 54 - 116-117). She overslept and did not get up until 8:30 and was supposed to be at work at 9:00 a.m., and the commute was 30 minutes. (R.R. 54 - 118-119). The girls were asleep in the living room and her sister Evelyn Long and her boys were gone. (R.R. 54 - 119-120). Cristina called her boss and told him she was running late because her daughter was not feeling well. (R.R. 54 - 122). When Cristina left, there were no bruises on the complainant's face and she was wearing a Minnie Mouse or Mickey Mouse nightgown. (R.R. 54 - 123).

Cristina testified Appellant called her at work about 1:45 p.m. (R.R. 54 - 132-133). He told her she needed to come home because the complainant was not breathing. (R.R. 54 - 133). She told him to call 9-1-1. (R.R. 54 - 134). Cristina told her sister, Evelyn, about the

3

emergency and her sister told her to call 9-1-1 but she did not. (R.R. 54 - 135-136). Cristina called Elva Nava, a friend, because she lived down the street and asked her to go over to the house. (R.R. 54 - 136). Cristina got home and saw Appellant come out of the bathroom; as she looked in, she saw the complainant on the counter. (R.R. 54 - 137-139). The complainant was now wearing different clothes than what she had on when Cristina left, she was bruised, and pale. (R.R. 54 - 138-139). Cristina saw bite marks on the complainant's belly. (R.R. 54 - 139-140). She called 9-1-1 from the house. (R.R. 54 - 140).

When Cristina was outside, after the paramedics had arrived, she told a police officer that Becky, the baby sitter had been with the complainant. (R.R. 54 - 155). She stated that she lied to the police because she was afraid of Appellant and she did not want to lose her other daughter. (R.R. 54 - 156). Previously, C.P.S. had been to the house for interviews. (R.R. 54 - 156). Cristina was prosecuted for making a false report to the police and was convicted by a jury and did 37 days in jail while pregnant. (R.R. 54 - 156-158). Later, Cristina gave a statement admitting she had previously not told the truth, and that it was Appellant who had been home with the children. (R.R. 54 - 159-160).

The State's first witness was Paul Brown, an E.M.T. with the Houston Fire Department. (R.R. 52 - 55). He arrived at the scene of the offense in a private vehicle because another crew member had the ambulance and he believed he could arrive at the scene more quickly. (R.R. 52 - 57-58). He saw Cristina standing outside. (R.R. 52 - 59). When he went in the house he saw the complainant on the bathroom sink and a woman trying

to perform C.P.R. (R.R. 52 - 60). Brown and Joey Dunn took over the C.P.R. (R.R. 52 - 60). Stella McDaniel, a paramedic arrived and she assisted in treating the complainant. (R.R. 52 - 61).

Joseph "Joey" Dunn testified that he was a volunteer firefighter and E.M.T. for the city of South Houston. (R.R. 52 - 89-90). He was working for the city on December 11, 2001, when he went to the scene of the offense with Brown. (R.R. 52 - 91-92). When he arrived he saw Cristina in the front yard, very excited. (R.R. 52 - 93). Cristina told him that her baby was breaking out in a rash and that she had been like that when dropped off with the babysitter. (R.R. 52-104). She also told him that she received a call at work that the baby was not breathing. (R.R. 52 - 104). She told them the babysitter was the woman who was performing C.P.R. on the complainant. (R.R. 52 - 104).

Dunn ultimately carried the complainant to the ambulance. (R.R. 52 - 95). When he was carrying her he noticed that the back of her head and neck felt like mush; he termed it crepitus. (R.R. 52 - 96). While treating the complainant, he noticed a large amount of blood in the vaginal area. (R.R. 52 - 102-103). Dunn did not notice anything unusual in the house or see a night gown in the bathroom. (R.R. 52 - 99).

Stella McDaniel, a paramedic with the City of South Houston testified she received a dispatch to 1016 Avenue N for a baby not breathing. (R.R. 108-110). Joe Ferguson, Brown, and Dunn were already at the scene when she arrived in the ambulance. (R.R. 52 - 110-111). There were bystanders and several people in the house when she arrived. (R.R.

5

52 - 111-112). She saw the men performing C.P.R. and noticed bruising on the complainant and told them men they needed to get out of there. (R.R. 52 - 113). She glanced around the bathroom and saw a sauce pan on the sink. (R.R. 52 - 114). As she was leaving, she spoke with the mother who asked her what had happened to the baby. (R.R. 52 - 115). Cristina told McDaniel that her girlfriend had been babysitting the complainant. (R.R. 52 - 115). McDaniel asked Cristina about the bruising and the mother told McDaniel that the bruises had not been there before she left for work. (R.R. 52 - 116).

When McDaniel went in the back of the ambulance, the complainant had no pulse. They continued, however, with C.P.R. She was directed to feel the back of the neck of the complainant and it was not normal. (R.R. 52 - 118). McDaniel noticed bruising on the abdomen, chest, and face. (R.R. 52 - 119). She also noticed what appeared to be adult human bite marks. (R.R. 52 - 119). While looking for a vein, she pulled off the pants of the complainant and saw blood on her panties. (R.R. 52 - 121). The blood was red and appeared to be recent. (R.R. 52 - 122). When she saw that, she called the police department on the radio. (R.R. 52 - 123). She told the police she thought the complainant had been sexually assaulted. (R.R. 52 - 123). The police arrived before they left the scene and she was able to tell them what she had found. (R.R. 52 - 125).

When they arrived at the hospital, the doctors and nurses took over. (R.R. 52 - 127-128). The nurse was unable to get a rectal temperature on the complainant due to the complainant's injuries. (R.R. 52 - 128). The complainant was pronounced dead at 3:15.

6

(R.R. 52 - 128).

South Houston police officer Richard Rees testified that on December 11, 2001 he was an I.D. officer and processed the scene. (R.R. 52 - 179-182). An ID tech, Jones, accompanied him. (R.R. 52 - 182-183). State Exhibit 6 was his drawing of the house. (R.R. 52 - 193). He found blood stains in the bathroom and hallway. (R.R. 52 - 198-99). He found bloody items- a one piece child's sleep wear, pair of panties, juvenile girl's panties, a bloody paper towel, and one sock. (R.R. 52 - 199). There was blood on the bathroom counter and hair. (R.R. 52 - 202-203). He took swabs of the blood. (R.R. 52 - 204-205). There were patent prints on the wall. (R.R. 52 - 205-206). The patent print was visible to the eye and appeared to be from human blood. (R.R. 52 - 206). There was blood splatter on the wall, which would be caused by high velocity impact (R.R. 52 - 208). He found a bloody t-shirt in the master bedroom. (R.R. 52 - 210). He also found a note that said for Cuzz to call Pete because he had come by. (R.R. 52 - 210). He did not collect the note, although in hindsight, he realized he should have. (R.R. 52 - 210). He photographed the marijuana, as well. (R.R. 52 - 215). Rees stated that his office was a bit overwhelmed with the offense - and were over their heads. (R.R. 53 - 14). He did not find a Mickey Mouse nightgown while examining the house and taking photographs. (R.R. 53 - 34-36). Jimmy Long, father of Michael and Brian Long testified that his ex wife Evelyn was the sister of Cristina Arredondo. (R.R. 53 - 66-67). The complainant was his niece. (R.R. 53 - 69). When he and his wife split, she lived at the complainant's house with the two boys. (R.R. 53 - 71).

Evelyn's boyfriend Gilbert also lived there with Cristina and her two children. (R.R. 53-72).

On December 10, 2001, he went over to the house to see his children after work. (R.R. 53 - 72-73). When he got there he saw Appellant and Evelyn, the complainant, and Alexis, the sister of the complainant. (R.R. 53 - 74-75). At that time, Gilbert was no longer living there. (R.R. 52 - 82). The complainant was happy that day because the next day was to be her birthday. (R.R. 53 - 75). She was wearing a long nightgown with Snow White or Minnie on it. (R.R. 53 - 98). Appellant mostly stayed in his bedroom with Cristina while Jimmy Long visited. (R.R. 53 - 75). Jimmy and Evelyn had to be in court the next morning for a child support matter. (R.R. 53 - 79). They both were at the courthouse in downtown a little after 8:00 a.m. (R.R. 53 - 80-81).

On December 11th, his sons were in elementary school and he went back to the house a little bit after 2:00. (R.R. 53 - 83). He had received a call from Evelyn and was worried about the boys which is why he went to the house. (R.R. 53 - 84). When he arrived, there were police officers everywhere. (R.R. 53 - 84). He went in the house and his boys were in there with Cristina and Alexis. (R.R. 53 - 85). He was told to leave the house, and after a bit everyone was out of the house. (R.R. 53 - 85-86). Jimmy stated that Cristina seemed confused, but not distressed. (R.R. 53 - 86). To this day, Jimmy testified that Evelyn was taking the death of the complainant harder than Cristina, the child's mother. (R.R. 53 - 88). He thought her reaction "weird." (R.R. 53 - 94).

Evelyn Long testified that she and Jimmy were in the process of divorcing but got along well. (R.R. 53 - 112). She and Jimmy had two young sons and she also had a baby daughter by Gilbert Postel. (R.R. 53 - 112-113). Evelyn and Cristina's relationship was not that good. (R.R.53 - 114). They both, however, worked at the same law firm. (R.R. 53 - 115). Evelyn got Cristina the job a couple months before the complainant died. (R.R. 53 - 115). Evelyn let Cristina and the girls move in with her because she felt sorry for her nieces. (R.R. 53 - 117-119). She let Appellant move in in August 2001. 53 - 120).

The night before the complainant died, Evelyn saw her come out of the bath tub and she had no bruises or marks on her. (R.R. 53 - 128-132). Cristina dressed the complainant in a Minnie Mouse nightgown. (R.R. 53 - 132). Alexis and the complainant sometimes slept in the room with their mother and Appellant, but other times slept on a pallet in the living room. (R.R. 53 - 136). The morning of the offense, Evelyn saw the complainant and Alexis on the pallet in the living room. (R.R. 53 - 139).

Evelyn went to work after her court hearing and saw Cristina there. (R.R. 53 - 126). Evelyn saw Cristina get a phone call and Cristina's eyes widened and she told Evelyn that Appellant had called and she had to leave because the baby was not breathing. (R.R. 53 - 146-147). Evelyn told her to call 9-1-1, but Cristina just walked slowly and left the office. (R.R. 53 - 147-148).

Evelyn went home later and learned her niece was dead. (R.R. 53 - 151-152). She got into the house about 8:00 p.m. and went to Jimmy's house. (R.R. 53 - 152-153). Later,

9

Appellant called her and she called the police. (R.R. 53 - 154-155).

Evelyn found the complainant's nightgown under the hot water heater on December 13, 2001. (R.R. 53 - 156, 167). After she found it, she called the police and she took it to the South Houston Police Department. (R.R. 53 - 156-157).

Pete Zamora testified he met Appellant in September 2001. (R.R. 53 - 203-05). Jesse Garcia introduced them. (R.R. 53 - 206). At the time, Appellant was living with Cristina and Steve Whipkey, also known as "Greedy," his girlfriend Priscilla and their kids (R.R. 53 - 206). Later Evelyn and her kids and boyfriend lived at Appellant's house. (R.R. 53 - 207-209). Zamora would stop be periodically because he did not work very far away. (R.R. 53 - 209). Zamora would also go over there to buy marijuana. (R.R. 53 - 210). He and Appellant would also smoke it together. (R.R. 53 - 210-211).

On December 11, 2001, Zamora did not work; he and a friend went to Appellant's house to buy some marijuana. (R.R. 53 - 212, 214). Zamora's friend drove him to Appellant's house; he knocked at the door for two to three minutes, but there was no answer. (R.R. 53 - 215). He then went back to the truck and wrote a note saying, "T Cuzz. Came by. Give me a call already." (R.R. 53 - 215). He put in on the doorknob, but as they were driving away, he saw Appellant standing at the door. (R.R. 53 - 217). They turned around; when he went back, Appellant was wearing only green boxer shorts. (R.R. 53 - 218). He told Appellant why he was there and when he went in the house, he picked up the note he had left and put it in the house. (R.R. 53 - 219-220). Appellant appeared to be a bit out of it,

10

according to Zamora, who said Appellant told him he had scored some "bars." (R.R. 53 - 220). Appellant told Zamora the marijuana was in the refrigerator. (R.R. 53 - 221). Zamora could not find the marijuana in the refrigerator and when questioned, Appellant told him it was in his room on top of the fish aquarium. (R.R. 53 - 222). Zamora bought $20 worth. (R.R. 53 - 223). Appellant still appeared to be high and told Zamora to lock the door on his way out. (R.R. 53 - 224). As he was leaving, Zamora saw both little girls covered in a blanket watching television. (R.R. 53 - 224-225). The complainant was alive when he left. (R.R. 53 - 227). He did see that the complainant had two bruises on her cheeks and one bruise on her forehead. (R.R. 53 - 227). The complainant did not have the bruises on her face that were exhibited in the state's photos after the complainant's death. (R.R. 53 - 228-231).

About 6:00 p.m. that night, Appellant called Zamora and told him that the complainant. (R.R. 53 - 233-234). Appellant told Zamora he woke up and she was dead. (R.R. 53 - 234). Appellant asked to come over to his house and he said it was O.K. (R.R. 53 - 234). When appellant arrived, Zamora asked him what happened and Appellant told him he woke up to find her dead and he tried to perform C.P.R. on her. (R.R. 53 - 234-235). Appellant had not even remembered that Zamora had been there that day. (R.R. 53 - 235).

Appellant told him he called Cristina at work who called the police. (R.R. 53 - 236-238). Because Appellant was wanted by the police, Cristina told him to take the Honda and

11

leave, which he did. (R.R. 53 - 238). Appellant tried to call Cristina, but ended up speaking to Evelyn. (R.R. 53 - 239). Zamora and Jesse and his girlfriend tried to talk Appellant into turning himself in, but he just told hem he wanted to speak with Cristina. (R.R. 53 - 240-241). Later Appellant drove off, ditched the car, and returned to Zamora's house. They then smoked marijuana and ordered a pizza, (R.R. 53 - 243-245). They then went to sleep and the next morning, Appellant was arrested at Zamora's house. (R.R. 53 - 245-246). Originally, Zamora was arrested and transported to the police station. (R.R. 53 - 246-247). He was later released and never charged with any crime. (R.R. 53 - 247-248).

Ultimately Zamora gave three separate statements to the police. (R.R. 53 - 249-251). Although there were some inconsistencies, regarding the time Appellant arrived, Zamora stated his testimony at the trial was truthful. (R.R. 53 - 251-252).

Juan Alberto Nava is the son of Elva Nava, and knows Appellant. (R.R. 54 - 19-21). Prior to December 11, 2001, he would hang out with Appellant quite a bit. (R.R. 54 - 22-23). On December 11, 2001, he received a call from his mother and he picked up his mother and headed to Appellant's house. (R.R. 54 - 23-24). When he arrived, he went in the house and saw Evelyn's two sons and Alexis. (R.R. 54 - 25). Juan saw Appellant in the hallway going crazy, saying he did not know what happened. (R.R. 54 - 26). In the bathroom were Appellant and Cristina and Juan's mother and Juan, as well. (R.R. 54 - 27). The complainant was lying on the bathroom counter top. (R.R. 54 - 28). Cristina was on the phone to 9-1-1 and his mother was giving the baby C.P.R. (R.R. 54 - 29). Cristina told

Appellant, who was pacing and crying, to leave. (R.R. 54 - 31-32). Juan knew that Appellant had a warrant out for his arrest. (R.R. 54 - 43). Juan left in Cristina's car with Appellant. (R.R. 54 - 32-33). Appellant told Juan that she was like that when he woke up and that Evelyn's boys had been beating her with sticks. (R.R. 54 - 33-34).

Juan's mother, Elva Nava testified that she considered Appellant almost like an adopted son. (R.R. 54 - 56-57). On December 11, 2001, Elva was not working. (R.R. 54 - 60-61). She received a call from Cristina who was hysterical and told her that there was something wrong with the baby. (R.R. 54 - 62-63). Cristina called her because she lived the closest. (R.R. 54 - 63). Elva called her son, who had her car, and he came and picked her up. (R.R. 54 - 63-65). When she and her son arrived, they saw three children - two boys and a girl. (R.R. 54 - 66). Cristina and Appellant were near the bathroom. (R.R. 54 - 67). Appellant was trying to give the complainant C.P.,R., but was doing it incorrectly, so Elva stepped in and replaced him. (R.R. 54 - 69). Elva was upset when Cristina implied to the paramedics that Elva was the babysitter and Elva had been watching the complainant that day. (R.R. 54 - 72-73). Elva saw Cristina give Appellant her car keys and told him to leave. (R.R. 54 - 73). Cristina testified she could not remember giving her car keys to Appellant or telling hm to leave. (R.R. 54 - 152-153). When Elva asked what happened, Cristina did not answer, nor did Cristina try to save her daughter's life. (R.R. 54 - 83-84).

South Houston Police Officer Edward Clayton Howard, Jr., assisted in executing an arrest warrant of Appellant. (R.R. 54 - 209-210). Officer Adam Sanders also assisted in the

arrest. (R.R. 54 - 214). Detective Guzman, also with the City of South Houston, assisted in preparing the arrest warrant for Appellant. (R.R. 55 - 8, 12). He also worked the scene and arrived when the complainant was in the ambulance. (R.R. 55 - 13). Cristina told him that Becky had been babysitting. (R.R. 55 - 14). Det. Guzman spoke with Alexis and his suspect became Appellant. (R.R. 55 - 15). At the police station, he assisted in the statements taken from Cristina, Pete, Elva, and Evelyn. (R.R. 55 - 16). He took an arrest warrant for Appellant to the magistrate - but while the magistrate signed it, he did not. (R.R. 55 - 20). Appellant was arrested and Det. Guzman read him his rights. (R.R. 55 - 23). Appellant was booked at the station and placed in Cell 4. (R.R. 55 - 25-26). In 2001, the police station had no way to tape or video record a statement being made. (R.R. 55 - 27-30). When Appellant was brought out of his cell, to the interview room, he was again read his rights and indicated he understood them. (R.R. 55 - 30-31). Appellant spoke with Det. Guzman and then was returned to his cell. (R.R. 55 - 32). After Det. Guzman conferred with Det. Davis, Appellant was questioned again. (R.R. 55 - 32-33). He was read his rights again. (R.R. 55 - 33). Det. Guzman stated that appellant refused to give a taped statement, but would give a written statement. (R.R. 55 - 34-35). Sylvia Carillo, a clerk with police department typed up the statement. (R.R. 55 - 39). Appellant gave his statement to Carillo, who typed it. (R.R. 55 - 41). She printed it and Det. Guzman read it back to Appellant. (R.R. 55 - 42). Appellant initialed the warnings and signed the statement. (R.R. 55 - 43-44). Sylvia Carillo testified that, as a clerk with the South Houston police Department, she typed the statement of

14

Appellant. (R.R. 55 - 112, 119-120). She admitted she used some of her own words when typing the statement of Appellant. (R.R. 55 - 123). She denied making any substantive changes. (R.R. 55 - 123-125). Over objection, the statement was admitted into evidence. (R.R. 55 - 44-45).

Dr. Vernique Delattre, a doctor of dental surgery and the Chief Forensic Dental Consultant for the Harris County Medical Examiner's Office, testified regarding forensic odontology. (R.R. 55 - 134-135). She testified regarding the study of bite marks as a science. (R.R. 55 - 136). She examined the body of the complainant on December 13, 2001. (R.R. 55 - 138). But since the autopsy had already been completed, she relied upon photographs, as well, in studying what appeared to be human bite marks. (R.R. 55 - 138-139). She stated it would have been better to examine the body before the autopsy, and for the impressions of Appellant to have been taken by her, rather than someone at the jail. (R.R. 55 - 139-140). She also would have preferred to have done her own pre-autopsy photos. (R.R. 55 - 141). Her reports, State Exhibits 101 and 102 were admitted without objection. She testified that on the body of the complainant, there were marks that appeared to be caused by adult human bites. (R.R. 55 - 149, 158). Based upon her review of Appellant's teeth impressions, she was unable to rule him out as having caused the bites. (R.R. 55 - 159). She admitted that she could not match the bite marks on the complainant's body with that of the Appellant with any reasonable probability. (R.R. 55 - 166).

The defense called Dr. Mike Bowers, a dentist and an attorney. (R.R. 60 - 42-43).

15

Dr. Bowers was also a member of the American Board of Forensic Odontology, to which only about 107 or 108 dentists out of 40 or 50,000 dentists are members of. (R.R. 60 - 45-46). He testified regarding the requirements for determining bite mark matches in forensic cases. (R.R. 60 - 47-55). Dr. Bowers testified that the procedures used by the State's expert, Dr. Delattre were below standard and basically meaningless. (R.R. 60 - 52). Her work was valueless under forensic standards. (R.R. 60 - 53-54).

Lisa Gefrides, a DNA Analyst with the Harris County Medical Examiner's Office, worked on the submissions from the instant case. (R.R. 55 - 172, 181-185). The submissions included swabs from Appellant, the complainant, Elva Nava, Juan Nava, Evelyn Long, Alexis Arredondo, Cristina Arredondo, as well as the Minnie Mouse nightgown and a hand towel. (R.R. 55 - 182-186). No seminal fluid was found. (R.R. 55 - 184).

The boxer shorts of Appellant were presumptively positive for blood. (R.R. 55 - 195-196). Also presumptively positive for blood were the swabs taken from the complainant, and several other admitted items including clothes and a paper towel and the Minnie Mouse nightgown. (R.R. 55 - 196-197).

Katherine Welch, with the Harris County Medical Examiner's Office testified that she was a supervisor in the DNA lab. (R.R. 55 - 201). Without objection, her reports were offered into evidence, State Exhibits 117A-E. (R.R. 55 - 219-220). On the blue jeans, the DNA matched the complainant. (R.R. 55 - 231-233). As to bite mark B-1, everyone could be excluded, except Appellant and the complainant. (R.R. 55 - 234-235). There was more

16

DNA which could not be matched with any of the samples taken; a possibility could have been an E.M.S. worker. (R.R. 55 - 235-236-237). As for Bite Mark 2, 3, and 4, everyone was again excluded except the complainant and Appellant. (R.R. 55 - 239-240). B-5 was consistent only with the complainant. (R.R. 55 - 240). The handle of the pot, Sample 37-A was consistent only with the complainant. (R.R. 55 - 240). Sample 37 B and C, the exterior of the pot was consistent with Appellant and the complainant, with all other samples being excluded; the same result was found for the tube sock and the boxer shorts. (R.R. 55 - 240-242). Of the tested items, there was no determination made whether they came from saliva, sweat, or tears. (R.R. 57 - 25).

Dr. Luis Sanchez, the Chief Medical Examiner for Harris County testified that he did not perform the autopsy on the complainant, but had reviewed the notes, photographs, slides, and report. (R.R. 59 - 33, 36-37). He also spoke with two neuropathologists regarding the instant case. (R.R. 59 - 38). Death resulted from blunt force trauma to the head. (R.R. 59 - 81).

The State presented a surprise witness on the Thursday of trial. (R.R. 57 - 71). The defense filed a motion for continuance and the Court agreed to hear the testimony of the witness outside the presence of the jury. (R.R. 57 - 75). After a hearing, the trial court overruled the defense motion to suppress the testimony and for a continuance, and allow Thomas Gilstrap to testify. (R.R. 58 - 14-15). During Gilstraps's testimony, he also interjected that he thought Appellant had already been convicted. (R.R. 59 30). The trial

court granted an instruction to the jury, but denied the motion for a mistrial. (R.R. 59 30).

Gilstrap testified that he was housed in the Harris County Jail from the fall of 2002 to early 2003. (R.R. 59 - 7). Gilstrap had several prior convictions and was in jail that time for beating his wife and for parole revocation. (R.R. 59 7). While in jail, he met Appellant. (R.R. 59 0 9). Gilstrap saw a report on the news regarding the instant case and called the District Attorney's office. (R.R. 59 9-11). According to Gilstrap, Appellant initiated conversation with him telling him that he was the one that killed the little girl. (R.R. 59 - 13). Appellant allegedly told him that he was the one in the news and that he had been watching the child of his girlfriend and when she made noise he spanked her. (R.R. 59 - 14). Appellant also told him that he had hit the girl in the bathtub but tried to get her back alive. (R.R. 59 - 15). Gilstrap also stated that Appellant told him he had failed an I.Q. test and he would beat the case because he was retarded. (R.R. 59 - 16).

After the State rested, the defense moved for an instructed verdict. (R.R. 60 - 38-39). The motion was denied. (R.R. 60 - 38-41).

Corrinne Vasquez testified that on December 2001, she was employed at the de'Simone law firm with Evelyn Long and Cristina Arredondo. (R.R. 60 - 77-78). She stated that on December 11, 2001, Cristina was late to work and Cristina told her that she was late because the baby had thrown up. (R.R. 60 - 79). Evelyn came in late with a court paper stamped Dec. 11th, 12:51 p.m. (R.R. 60 - 81-82). Vasquez testified that Cristina had only come in an hour or so before her sister. (R.R. 60 - 84). Vasquez believed Cristina arrived

at work between 11:00 and 12:00. (R.R. 60 - 85-86).

Dr. Richard Garnett testified for the defense regarding the parameters of mental retardation. (R.R. 60 - 99-103). He explained that mental retardation is a condition characterized by significant limitations and intellectual functioning and adaptive behavior. (R.R. 60 - 101-103). Mental retardation is a developmental process and a disability having to do with intellect and the ability to think through things. (R.R. 60 - 102, 105). Before anyone can be diagnosed as mentally retarded, there has to be a determination of their intellectual level. (R.R. 60 - 112). An I.Q. of 70 drops a person to a significantly sub-average level. (R.R. 60 - 133). Along with the I.Q. test, adaptive behaviors are also examined. (R.R. 60 - 117-118).

In Appellant's case, Dr. Garnett reviewed the records from the Palo Verde Unified School district, an interview with Charlene Gallo in 2002, a statement by Appellant in 2001, various police and juvenile justice and court records, and the psychiatric evaluation by Dr. Denkowski. (R.R. 60 - 124). His school records established he was in the 5 percentile group for standardized testing in 1984, when he was 8. (R.R. 60 - 124-125). Subsequent test scores also showed very low percentiles, 11 out of 15 being below the six percentile. (R.R. 60 - 126-127). When Appellant was 13, he was placed in special education classes. (R.R. 60 - 127-128). In 1991, the Wexler Intelligence Scale showed an I.Q. score of 74 with a plus or minus of five points. (R.R. 60 - 131). He also took a cognitive development test and scored 61. (R.R. 60 - 134). Dr. Garnett testified that for all the tests, Appellant's scores were at or

below the 5th grade level of achievement. (R.R. 60 - 134). In reviewing Dr. Denkowski's report, Appellant received an I.Q. test score of 68 when he was 27. (R.R. 60 - 136-137). Dr. Denkowski's report also showed an adaptive behavior assessment test of 71. (R.R. 60 - 137). Dr. Denkowski concluded that, although the scores were within the range for mental retardation, Appellant was not retarded based upon influences that impacted the score. (R.R. 60 - 138). Dr. Garnett agreed with the testing mechanisms of Dr. Denkowski, but not the conclusion. (R.R. 60 - 138-139). Dr. Garnett understood Dr. Denkowski to take the existing scores from 1991 and apply them to a different norm than what Appellant fell into. (R.R. 60 - 139-140). Dr. Garnett did not agree with that practice nor consider it commonly accepted. (R.R. 60 - 140). Dr. Garnett explained that if a test is given to a 14 and a half year old, then the score is applied to that range alone. (R.R. 60 - 140). As Dr. Garnett explained, Dr. Denkowski took the 1991 scores and applied them not to the standardized norms for that age group, but to a different group, to get a different result. (R.R. 60 - 141). Also Dr. Denkowski noted that Appellant received "good grades," but as Dr. Garnett explained, those good grades were in special education classes and are not uncommon. (R.R. 60 - 144-146). After reviewing all the records and interviewing Appellant, Dr. Garnett concluded he suffered from mental retardation. (R.R. 60 - 148-149).

As for the statement given by Appellant, Dr. Garnett explained that people with mental retardation try to hide their disability and please others. (R.R. 60 - 149-150). Additionally, Appellant's level of understanding is somewhere around the second grade

level, and the Miranda warnings are based upon a level of understanding for seventh grade. (R.R. 60 - 150).

On cross, the State challenged the qualifications of Dr. Garnett to testify under *Texas Code Crim. Proc. art. 46B.022*, which was objected to by the defense. (R.R. 60 - 164-166). The trial court overruled the objection and allowed the State to impeach Dr. Garnett's credentials and ability to testify. (R.R. 60 - 146).

On rebuttal, the State called Dr. George Carl Denkowski. (R.R. 61 - 6). Dr. Denkowski explained that he has a Ph.D. in counseling psychology and is not a medical doctor. (R.R. 61 - 7). Dr. Denkowski was the chief psychologist for the Fort Worth State School and Dr. Garnett was a master's level psychologist there. (R.R. 61 - 9). At the school he worked with adolescent mentally retarded from 15 to 19 years old. (R.R. 61 - 10). Dr. Denkowski has done studies on mentally retarded offenders in the prison systems. (R.R. 61 - 11). From 1975 to 1999, he worked almost exclusively with mentally retarded people and had day to day contact with them. (R.R. 61 - 12). In the three years prior to the trial, Dr. Denkowski testified that he has worked on behalf of the State of Texas in various jurisdictions for eight individuals claiming mental retardation. (R.R. 61 - 13-14). Two of the cases were for the defense and six for the State. (R.R. 61 - 15). Of the eight cases, he found four to be mentally retarded. (R.R. 61 - 15).

Dr. Denkowski testified that based upon his evaluation of Appellant, he was not mentally retarded. (R.R. 61 - 20). He based his decision on the fact that he believed

Appellant's true I.Q. score was above 70. (R.R. 61 - 21). Additionally, based upon the information he gathered in regards to the adaptive behavior, he is not deficient in that area. (R.R. 61 - 21). Just because someone might be a slow learner or low functioning, does not mean they are mentally retarded, according to Dr. Denkowski. (R.R. 61 - 21-22).

Dr. Denkowski's testing of Appellant which resulted in an I.Q. score of 68 is merely a range - it could be 65 to 73. (R.R. 61 - 28). In reviewing Appellant's previous I.Q. score of 74, the range is probably closer to 73, based upon Dr. Denkowski's opinion. (R.R. 61 - 28). Dr. Denkowski also stated that because of Appellant's "lack of achievement, motivation, his disinclination to apply himself in school," was a contributing factor to the doctor determining the lower I.Q. score did not mean mental retardation. (R.R. 61 - 30-31).

Over objection, Dr. Denkowski stated that he consulted with experts all over the country on mental retardation regarding Appellant's case, and those experts also agreed that Appellant was not mentally retarded. (R.R. 61 - 57-61). The defense objected based on the fact there was no way to cross examine these experts, but the trial court overruled the objection. (R.R. 61 - 59).

Dr. Denkowski spent several hours testing Appellant, as well as speaking with some of his former teachers and a probation officer. (R.R. 61 - 23-24). In speaking with Appellant, he learned that Appellant had a job which required testing because of the biohazard nature of it. (R.R. 61 - 25-26).

James Smallwood, a teacher at the Palms High School, testified he was familiar with

Appellant when Appellant went to his school. (R.R. 61 - 129, 136). Appellant was in the restaurant division of the culinary class at his vocational school. (R.R. 61 - 137). In the class, they were taught several things such as short order cooking and dishwashing. (R.R. 61 - 137-138). Some of his students were labeled T.M.R. - trainable mentally retarded. (R.R. 61 - 140). Appellant was not in that class. (R.R. 61 - 141).

Susan Distal, a supervisor with the Riverdale County Probation Department in Blythe, California, testified that she knew Appellant for about two years. (R.R. 61 - 150-152). She visited him at school and he was required to come to her office, although he missed several appointments. (R.R. 61 - 152-153). She stated that when Appellant was motivated, his grades at school would go up. (R.R. 61 - 156-157).

After argument of counsel, the jury returned with a verdict of guilty on the capital murder charge. (R.R. 62 - 80).

At a hearing before punishment, the defense objected to the admission of unadjudicated extraneous offenses. (R.R. 63 - 10). The record refers to the previous mistrial punishment hearing where those objections are re-urged. (R.R. 63 - 10-11). The motions were heard in Volume 14 on November 15, 2002. (R.R. 63 - 10). The defense also objected to any mention of gang activity by Appellant. (R.R. 63 - 13). The Court relied on *Mason* and overruled the defense objection. (R.R. 63 - 12-14). The defense also objected to the admission of the juvenile sentences in Exhibits 140 and 141 because they were not found beyond a reasonable doubt, based upon *Apprendi* and *Ring*. (R.R. 63 - 14). The trial court

overruled the objection. (R.R. 63 - 15).

*Punishment*

During punishment, over objection, the court admitted into evidence State exhibit 135, which was a judgment and sentence from Atascosa County for aggravated assault. (R.R. 64 - 13-14). Also over objection, State Exhibit 152 was admitted, which were jail records showing several offenses Appellant committed while incarcerated in the Harris County Jail, specifically: 3/25/02, possession or manufacture of a weapon; 6/21/2002, unauthorized passing of items; 3/8/2003, assault on an inmate; 8/8/2003, refusing to obey an order; 8/12/2003, assault on an inmate; and, 8/12/2003, extortion. (R.R. 64 - 14-15).

Susan Distal, who had testified during the guilt/innocence phase, testified that as a probation officer, she supervised Appellant. (R.R. 64 - 18-19). Over objection, State Exhibits 140 and 141 were admitted, which were juvenile convictions for exhibiting a deadly weapon and negligent discharge of a firearm. (R.R. 64 - 21-22). She stated she would visit Appellant's home and it appeared nice and normal..(R.R. 64 - 22-24). She also testified that in the community, Appellant had a bad reputation for being peaceful and law abiding. (R.R. 64 - 28-29).

Rocky Milano, was a police officer in Blythe, California. (R.R. 64 - 36-37). In his opinion, Appellant was not a peaceful and law-abiding citizen. (R.R. 64 - 37-38).

Noelia Gallo had testified at the previous trial and was missing at this trial, so her

prior testimony was stipulated to and read into the record. (R.R. 64 - 39-40). Noelia Gallo was previously married to Appellant and they had three children. (R.R. 64 - 41-42, 45-46). She stated that when she met Appellant he was a gang member. (R.R. 64 - 44). They also did drugs together, including meth and marijuana. (R.R. 64 - 47). He also cheated on her with her niece. (R.R. 64 - 50). She also stated that in an argument at her house, Appellant stabbed another man. (R.R. 64 - 52-53). She also previously filed reports and restraining orders for Appellant hitting her. (R.R. 64 - 53-56). She conceded, however, that she was physically aggressive, as well. (R.R. 64 - 68). She also testified that Appellant would bite their children and she considered it playing. (R.R. 64 - 65-66).

Officer Tracy Marshall of the Pasadena Police Department testified that he worked the gang task force and first noticed Appellant because of his tattoos. (R.R. 64 - 70-74). He stated his tattoos were what was regularly seen on gang members. (R.R. 64 - 74). He stated that Appellant told him he was a gang member. (R.R. 64 - 75). State Exhibit 138, a photo of Appellant's tattoos was admitted over objection. (R.R. 64 - 76).

Officer Robert Matthews of the Blythe, CA Police Department testified Appellant was a member of a gang. (R.R. 64 - 81-83). He also asserted that Appellant's reputation was neither peaceful nor law-abiding. (R.R. 64 - 83-84). The testimony of Officer Debbie Gray was stipulated to form the previous trial and read into the record. (R.R. 64 - 84). She was also a Blythe, CA police officer and was familiar with Appellant. (R.R. 64 - 85-86). She concurred with Officer Matthews that he did not have a peaceful or law-abiding reputation.

25

(R.R. 64 - 86). Officer Daniel Swanson, formerly with the Blythe, CA Police Department testified regarding Appellant's gang affiliations and the numerous tattoos of Appellant. (R.R. 64 - 89 - 103). Over objection, the trial court admitted State Exhibit 137, a photograph of one of Appellant's tattoos referencing the complainant and R.I.P. (R.R. 64 - 103-105).

Deputy D.S.Farrington's prior testimony was also read by stipulation. (R.R. 64 - 109. While working in the Harris County Jail, he testified that Appellant had a rag on his head which was against the rules, as well, as homemade "hooch," and pens that could be used for tattoos. (R.R. 64 - 110-116).

Steven Whipkey testified that he hung out with Appellant and knew Appellant to be a gang member. (R.R. 64 - 86-88). Jessica Riojas testified that when she was 14 she began having sexual relations with Appellant and had a child by him. (R.R. 64 - 121-130).

Maria Arredondo, the mother of Cristina and Evelyn, testified the complainant was a beautiful and good girl. (R.R. 64 - 131-132). She also stated that in September 2001, she noticed bruises on the complainant and called C.P.S. (R.R. 64 - 132-133). Maria called Appellant an animal and the trial court instructed the jury to disregard, but refused the request for a mistrial. (R.R. 64 - 135, 138). The defense also objected to Maria's testimony regarding the effect of the death on the complainant's sister, but that was also overruled. (R.R. 64 - 137-138).

The defense presented the testimony of Melinda Bates, a teacher at Palo Verde High School in Blythe, CA. (R.R. 65 - 10). She knew Appellant because his brother was in her

Special Education class. (R.R. 65 -12). She also knew his mother, as well. (R.R. 65 -12). Appellant was in her resource class which is for students with learning disabilities. (R.R. 65 -15-16). Because she taught Appellant, she reviewed his prior school records which revealed that he was below average from the time he started school. (R.R. 65 -17). She recalled Appellant as being polite and respectful, although he struggled with school. (R.R. 65 -17-18). Appellant was in Special Education and Resource classes where he might have made high grades, but they were not regular classes. (R.R. 65 -19-20).

Appellant's mother, Charlene Gallo, testified that when growing up ,she had been raised by alcoholic parents and abused. (R.R. 65 -34). She had three children by Appellant's father. (R.R. 65 -34-35). When Appellant was born he had to stay in the hospital because Charlene had a venereal disease when she delivered him. (R.R. 65 -35). Appellant's father abused Charlene and raped her. (R.R. 65 -36). When Appellant was four, his father abandoned the family. (R.R. 65 -36-37). Several months later, when Charlene let the boys visit with their father, he put a gun in her mouth and refused to let her take the children back, all in front of the boys. (R.R. 65 -38-39). Ultimately, she got the boys back and they never really saw their father again. (R.R. 65 -39).

Charlene also did drugs. (R.R. 65 -39-40). Based upon the severity of the beatings she received from Appellant's father, Charlene suffered from serious injuries requiring several hospitalizations. (R.R. 65 -40). While hospitalized, Appellant and his brothers had to go to foster homes, several times from six weeks to six months at a time. (R.R. 65 -40).

27

She married another man, Hal Reynolds, who had two children and because of her situation, she cared more for his children than her own. (R.R. 65 -41-42). Charlene had no way to care for her children without the support of Reynolds. (R.R. 65 -42). She treated her children far worse than Reynolds' children. (R.R. 65 -42). She would lock her own kids in the basement or put chili sauce in their mouths and never did that to Reynolds' children. (R.R. 65 -42-43).

Charlene stated that she always needed to repeat things to Appellant and he often looked like e did not understand her. (R.R. 65 -50). He did not learn the alphabet until 5th or 6th grade. (R.R. 65 - 52). He had trouble tying his shoe laces. (R.R. 65 - 52). He was unable to go to the store and get what was on the list. (R.R. 65 -52-53). He could not make change. (R.R. 65 -53-54). He could not find his way on the streets or use a map. (R.R. 65 - 54). He could not tell time. (R.R. 65 -54). Becky Cortinas testified that Appellant was a good friend who would give her advice. (R.R. 65 -78-80). Rodolfo Pinon testified that he knew Appellant when Pinon worked with youths in California. (R.R. 65 - 83-85). He testified that in Blythe while Appellant was growing up, the gang problem was terrible and people could not go out at night. (R.R. 65 -87-90).

The defense also presented the testimony of Steve J. Martin, an attorney and correctional consultant. (R.R. 65 -112). His expertise is in prisons and he worked substantially with the Texas prison system. (R.R. 65 -112-116). He explained the typoe of system that would determine where Appellant would be housed, were he not to receive the

death penalty. (R.R. 65 -118-119). A video was shown demonstrating what a prison is like. (R.R. 65 -120).

After argument of counsel, the Jury returned with a an answer of "yes," to Special Issue One, and "No," to Special Issue Numbers Two and Three, resulting in a sentence of death. (R.R. 46 - 48-49).

# ISSUES FOR REVIEW

1. The Evidence Is Legally and Factually Insufficient to Support the Jury's Determination That Appellant Is Not Mentally Retarded.

2. The Trial Court Erred by Not Granting a Mistrial When *ex Parte Briseno* Was Handed down by the Texas Court of Criminal Appeals in the Middle of Trial, Prejudicing Appellant's Presentation of the Mental Retardation Evidence. (Cr Iv - 766).

3. The Trial Court Erred by Rejecting Appellant's Proposed Instructions Regarding Mental Retardation, Especially in Light of *ex Parte Briseno*.

4. The Trial Court Erred in Denying Appellant's Requested Charge for Instructions Directing the Jury to Disregard His Statement If They Determine That His Mental Impairment Prevented Him from Understanding His Miranda Rights and Executing an Understanding, Intelligent Waiver of Rights.

5. The Trial Court Erred by Denying the Motion to Suppress Gruesome Photographs Admitting into Evidence over Proper Objection, Numerous, Repetitious Gruesome Photographs of the Dead Complainant, a Three Year Old Child in Violation of the Eighth and Fourteenth Amendments to the United States Constitution.

6. The Trial Court Erred in Refusing to Grant a Continuance When the State Brought Forth a Surprise Witness Who Stated Appellant Confessed to the Crime and That Appellant Confessed He Was Faking His Mental Retardation in Violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constituion.

7. The Trial Court Erred in Not Allowing in the Testimony of Defense Expert Dr. Holden, Regarding the Issue of Filicide in Violation of the Eighth and Fourteenth Amendments to the United States Constitution.

8. The State Purposefully Attacked Appellant over the Shoulders of Defense Counsel and Subjected Appellant to Epitaphs Unworthy of Courtroom Decorum and in Violation of the United States Constitution.

9. The Trial Court Erred in Refusing to Allow the Defense to Present Testimony from Appellant's Family about the Impact His Execution Would Have on the Family, in Violation of Appellant's Eighth Amendment and Due Process Rights.

10. The Trial Court Erred in Denying the Defense Request for an Instruction Allowing the Jurors to Consider Any Residual Doubt as a Mitigating Circumstance When Answering the Mitigation Special Isue and the Continuing Threat Special Isse, Depriving Appellant of His Right to Lace All Mitigating Evidence, Including the "Circumstances of the Offense" Within the Jury's Effective Reach in Violation of the Eighth and Fourteenth Amendments to the United States Constituion.

11. The Trial Court Erred by Refusing Appellant's Request to Give the Closing Argument at Punishment on the Mitigation Special Issue in Violation of the Eighth and Fourteenth Amendments to the United States Constituion.

12. The Trial Court Erred in Denying the Motion to Preclude the Death Penalty as a Sentencing Option Or, in the Alternative Quash the Indictment - *Apprendi/Bush v. Gore* in Violation of the Eighth and Fourteenth Amendments to the United States Constitution.

13. The Trial Court Erred in Denying Appellant's Motion to Preclude the Use of the Death Penalty (Pancuronium Bromide) in Violation of the Eighth and Fourteenth Amendments to the United States Constitution.

1.    The Evidence Is Legally and Factually Insufficient to Support the Jury's Determination That Appellant Is Not Mentally Retarded.

*Summary of the Argument:*

As detailed in the statement of facts, the defense expert testified at length regarding Appellant's mental retardation. In fact, the State's own expert placed Appellant's I.Q. score at 68, but by changing some standard norms around, that expert determined Appellant was *not* mentally retarded. All evidence is to the contrary and the evidence is sufficient to support Appellant's claim that he is mentally retarded.

*Statement of Facts*

As detailed in the Statement of Facts section, after reviewing all the records and interviewing Appellant, Dr. Garnett concluded he suffered from mental retardation. (R.R. 60 - 148-149). One of the issues, as discussed below, is the fact that Appellant was precluded from presenting the type of evidence detailed in *Briseno* as necessary because the trial court refused to grant to motion for continuance or a mistrial. However, taking the competing experts of Dr. Garnett and Dr. Denkowski, the evidence clearly shows that Appellant is mentally retarded and the evidence was sufficient to support that conclusion.

*Argument and Authorities*

**Legal Insufficiency**

In reviewing the sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, and also

32

would have found against appellant on the defensive issue beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury. *See Id.* All reasonable inferences from the evidence are construed in favor of the verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Casilla*, 20 F.3d 600, 602 (5th Cir. 1994). A review concentrates on whether the trier of fact made a rational decision to convict or acquit, not whether the fact finder correctly determined the defendant's guilt or innocence. *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1344 (5th Cir. 1994). Further, the evidence need not exclude every reasonable hypothesis of innocence. *United States v. Velgar-Vivero*, 8 F.3d 236, 239 (5th Cir.1993). **However, a conviction must be reversed if the evidence construed in favor of the verdict "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."** *United States v. Jaramillo*, 42 F.3d 920, 922-23 (5th Cir. 1995)(*citing United States v. Menesses*, 962 F.2d 420, 426 (5th Cir.1992); *Clark v. Procunier*, 755 F.2d 394, 396 (5th Cir.1985) *(quoting Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir.1982)).(emphasis supplied). The Fifth Circuit has explained this reasoning as follows:

> If the "evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory

of innocence of the crime charged," this court must reverse the convictions. *Clark v. Procunier*, 755 F.2d 394, 396 (5th Cir.1985) *(quoting Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir.1982)* (as quoted in *United States v. Fortenberry*, 919 F.2d 923, 926 (5th Cir.1990)). This is so because, as was observed by the late Judge Alvin B. Rubin, **where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict, "a reasonable jury must necessarily entertain a reasonable doubt."** *Id.* (*quoting Cosby* at id.).(emphasis supplied).

*United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992).

**Factual Insufficiency**

In a factual sufficiency review, the appellate court views all the evidence in a neutral light and determines whether evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt or if evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Zuniga v. State*, 144 S.W.3d 477, 486 (Tex.Crim.App. 2004).

Article V, § 6 of the Texas Constitution provides that decisions of the courts of appeals "shall be conclusive on all questions of fact brought before them on appeal or error." See TEX. CONST. ART. V, § 6. *See also Mireles v. State*, 994 S.W.2d 148, 149 (Tex.Crim.App.1999) (citing *Meraz v. State*, 785 S.W.2d 146, 154 (Tex.Crim.App.1990), and *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997)) (the Texas Constitution confers conclusive jurisdiction on the courts of appeals to resolve questions of weight and preponderance of the evidence).

In *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App. – Austin, 1992, pet. ref'd), the Third

Court of Appeals held that when a party requests a factual sufficiency review, the court of appeals is duty bound to conduct same. A factual sufficiency review, unlike a legal sufficiency review, discussed *supra*, is not centered around a view of the evidence in a light most favorable to the State. Rather, the *Stone* Court explained that a factual sufficiency review requires consideration of defense witness testimony and alternative hypotheses, including necessarily defensive theories such as Appellant's theory of self defense. The *Stone* Court explained its reasoning:

> The Court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Before reversing a conviction on this basis, the court should detail the evidence and clearly state why the jury's verdict is so contrary to the overwhelming weight of the evidence as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias, and further state how the evidence contrary to the jury's verdict overwhelmingly outweighs the evidence that supports the verdict.

*Stone*, 823 S.W.2d at 381. The Court of Criminal Appeals adopted the *Stone* Court's standard of review for factual sufficiency of the elements of an offense, as the proper standard in Texas. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). The Court of Criminal Appeals affirmed the continuing viability of the *Stone/Clewis* factual sufficiency standard of review in *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App. 2000).

In *Johnson v. State*, 23 S.W.3d at 7, the Court of Criminal Appeals held:

> "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Id, citing Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997)."

*Id.* Further, the Court explained:

> "In conducting its factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination." *Clewis v. State*, 922 S.W.2d at 133. This review, however, must employ appropriate deference to prevent an appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony. *Jones v. State*, 944 S.W.2d at 648.

*Id.*

To ensure that this proper standard of review has been followed and to ensure that a reviewing court is not merely usurping the role of the fact finder, certain procedural requisites have been erected. *Clewis v. State*, 922 S.W.2d at 135-36; *Meraz v. State*, 785 S.W.2d 146, 154 (Tex.Crim.App.1990); *Pool v. Ford Motor Company*, 715 S.W.2d 629, 635 (Tex.1986). When reversing on insufficiency grounds, the appellate court should detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient. The opinion should state in what regard the *contrary evidence greatly outweighs the evidence in support of the verdict. Clewis v. State*, 922 S.W.2d at 135.

In conducting such a factual sufficiency review of the evidence, an appellate court reviews the fact finder's weighing of the evidence, although it cannot substitute its judgment for that of the fact finder. *See Clewis*, 922 S.W.2d at 133. This review begins with a presumption that the evidence is legally sufficient, under *Jackson v. Virginia,* to support the verdict, and sets aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis*, 922 S.W.2d at 134.

**Factually Insufficient**

In *Vodochodsky v. State*, 158 S.W.3d 502 (Tex.Crim.App. 2005), this Court reversed a death case based on factually insufficient evidence. While the facts are glaringly different than the instant case, the analysis, is persuasive and instructive:

> In this case, the overwhelming weight of the evidence mitigates against the conclusion that Vodochodsky solicited, encouraged, directed, aided or attempted to aid Engleton in committing the offense. *All of the evidence that could legally support a rational jury's conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined.* Although there was *some evidence* of a second shooter on the roof, this was not established. While Vodochodsky's statements were inconsistent, the inconsistencies were minor. When Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan, neither man specifically mentioned killing a peace officer. When Vodochodsky told Essary that he bailed Engleton out of jail "to do this," he did not specifically state that he bailed him out as part of a plan to kill police officers. Vodochodsky removed belongings from the house, but there is no proof that he did so as part of a murderous plot. And Vodochodsky's comment to Essary that Engleton had "gone over the edge" when he took the deputy's gun could just as reasonably have been a speculative comment, not one indicating that Vodochodsky had witnessed Monse's murder.
>
> *Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent to promote or assist Engleton. None of his statements directly refer to killing police officers. His statements are devoid of information on the details of the alleged murder plot, and there is no other information in the record suggesting that Vodochodsky was planning the event with Engleton.*
>
> Furthermore, *other evidence suggests that Vodochodsky was not working with Engleton.* His whispered warning to Sara could indicate that while he may have known of Engleton's plan, he was not a party to it. He did not participate in the purchase of ammunition. *There is no evidence that Vodochodsky actually did any affirmative act to assist Engleton with the plan.* Instead, Vodochodsky had the bad luck of being the friend and roommate of a man determined to kill police officers and himself.
>
> *We conclude that proof of Vodochodsky's guilt was so weak as to undermine confidence in the jury's determination. This evidence was factually insufficient to convict.* (Emphasis supplied).

37

*Vodochodsky*, 158 S.W.3d at 510-11.

Comparing the analysis, it is clear that the evidence was sufficient to establish Appellant is mentally retarded. Dr. Garnett's thoughtful presentation regarding all the factors considered in determining mental retardation surpass the State's expert that Appellant is not mentally retarded. Additionally, the testimony of Appellant's mother supports this conclusion. She stated that she always needed to repeat things to Appellant and he often looked like he did not understand her. (R.R. 65 -50). He did not learn the alphabet until 5th or 6th grade. (R.R. 65 - 52). He had trouble tying his shoe laces. (R.R. 65 - 52) . He was unable to go to the store and get what was on the list. (R.R. 65 -52-53). He could not make change. (R.R. 65 -53-54). He could not find his way on the streets or use a map. (R.R. 65 - 54). He could not tell time. (R.R. 65 -54).

The jury's conclusion was erroneous and should be reversed.

2. The Trial Court Erred by Not Granting a Mistrial When *ex Parte Briseno* Was Handed down by the Texas Court of Criminal Appeals in the Middle of Trial, Prejudicing Appellant's Presentation of the Mental Retardation Evidence.

*Summary of the Argument*:

The decision by the Texas Court of Criminal Appeals in *Ex parte Briseno* was handed down in the midst of trial. This was the first case from this Court regarding the implications for the State of Texas in light of *Atkins v. Virginia*. The defense needed time to study *Briseno* and also the effect it would have on their presentation of evidence in the instant case.

*Statement of Facts*

The defense moved for a mistrial based upon the decision of the Texas Court of Criminal Appeals in *Ex parte Briseno* had been decided the day both sides rested, and the day before closing arguments in guilt/innocence. (R.R. 62 - 4 - 6). The defense explained that had the attorneys had the decision of *Briseno*, their entire case would have been different based upon the Court's decision regarding how mental retardation in death cases was to be handled. (R.R. 62 - 5-6). The defense explained that under *Briseno*, now lay testimony became far more important and without a mistrial, Appellant was harmed by their representation. (R.R. 62 - 6-7). The trial court denied the request for a mistrial. (R.R. 62 - 7).

The Defense re-urged this motion before beginning their punishment case. (R.R. 65 - 7). The defense explained to the Court that after studying *Briseno*, he needed another continuance which was again denied. (R.R. 65 - 8).

39

Appellant filed a motion for continuance based upon *Briseno*, detailing the unexpected occurrence at trial:

> Defendant's trial began on Tuesday, February 3, 2004. On Wednesday, February 11, 2004, the Court of Criminal Appeals issued a lengthy opinion in a capital murder case, *Ex parte Briseno*. The Court chose one of the many retardation capital cases pending before it, announce[d] a Texas standard for presenting and deciding whether a capital murder defendant is mentally retarded and thus exempt from the death penalty. The legislature had not acted upon the issue, and the Court decided to step in with a judicial analysis, a burden of proof and a procedure to fill in the gap until the legislature did act. The unexpected aspect of *Briseno*, as it affects Defendant, is that the opinion altered the existing standard significantly, and so altered Defendant's punishment strategy, and his ability, on such short notice, to present and effective defensive case under the altered standard.
> Diligence
> The United States Supreme Court had issued its opinion in *Atkins v. Virginia* last year, leaving it to the states to determine the procedures for classifying capital defendants as mentally retarded. The Court in *Atkins* employed the AAMR standard for determining mental retardation. In preparing Defendant's defensive case of retardation, counsel have used that same AAMR standard, and pursuant to that standard they have gone to great lengths to obtain expert testimony in support of Defendant's mental retardation defense., in order to instruct his jury about the various complex aspects of diagnosing mental retardation as a matter of medical skill, and to educate them about the reasons a layperson might not recognize mental retardation by looking only at apparent adaptive "skills" when in fact mental retardation is present. Counsel were especially conscious of the need to educate jurors with expert testimony about the improper application of criminal facts in diagnosing mental retardation.
> The State met that expert testimony with its own expert testimony at the trial on guilt.
> Now the *Briseno* opinion has elevated the adaptive behavior category, and especially lay witness testimony in that category far above that of expert testimony, assigning it superior status and making it a decisive factor in both quality and quantity. Defendants case has been changed significantly for purposes of presentation and review.
> The State in its punishment case has now presented evidence from lay witnesses, as opposed to expert witnesses, which is the category of evidence

40

the *Briseno* opinion has made virtually controlling, and it is beyond
Defendant's power, on such short notice, to put on an effective defensive case
or an effective lay witness response, when his strategy had logically been
directed elsewhere under the pre-Briseno decisions.

(C.R. IV - 767-768). The motion continued to detail the prejudice Appellant suffered

because the trial court refused to grant the motion for continuance. (C.R. IV - 768-769).

*Argument and Authorities*

In *Briseno*, the Court explained the importance of adaptive behaviors in determining

mental retardation:

The adaptive behavior criteria are exceedingly subjective, and undoubtedly
experts will be found to offer opinions on both sides of the issue in most cases.
There are, however, some other evidentiary factors which factfinders in the
criminal trial context might also focus upon in weighing evidence as indicative
of mental retardation or of a personality disorder:
. Did those who knew the person best during the developmental stage--his
family, friends, teachers, employers, authorities--think he was mentally
retarded at that time, and, if so, act in accordance with that determination?
. Has the person formulated plans and carried them through or is his conduct
impulsive?
. Does his conduct show leadership or does it show that he is led around by
others?
. Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?
. Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?
. Can the person hide facts or lie effectively in his own or others' interests?
. Putting aside any heinousness or gruesomeness surrounding the capital
offense, did the commission of that offense require forethought, planning, and
complex execution of purpose?
Although experts may offer insightful opinions on the question of
whether a particular person meets the psychological diagnostic criteria for
mental retardation, the ultimate issue of whether this person is, in fact,
mentally retarded for purposes of the Eighth Amendment ban on excessive
punishment is one for the finder of fact, based upon all of the evidence and

41

determinations of credibility.

*Ex parte Briseno,* 135 S.W.3d 1, 8 - 9 (Tex. Crim. App. 2004). Although unpublished, a

recent opinion by this Court again demonstrates the type of evidence necessary to sustain an

*Atkins* claim under *Briseno* to which Appellant was unaware when he went to trial:

> The second prong of a mental-retardation claim requires analysis of applicant's
> adaptive behavior skills. Adaptive behavior refers to "the effectiveness with
> or degree to which a person meets the standards of personal independence and
> social responsibility expected of the person's age and cultural group." Tex.
> Health & Safety Code § 591.003(1). Some persons whose IQs fall within the
> accepted range of mental retardation are still able to function quite well in
> society, while others, whose IQs are presumptively not within the range of
> mental retardation, have maladaptive behaviors to an extent that renders them
> unable to care for themselves adequately. In Briseno, this Court examined
> seven factors to gauge the level of an individual's adaptive functioning. [FN2]
>
>> FN2. The *Briseno* Court weighed the following factors as
>> indicative of mental retardation: (1) did those who knew the
>> person best during the developmental stage, his family, friends,
>> teachers, employers, authorities, think he was mentally retarded
>> at that time, and if so, act in accordance with that determination;
>> (2) has the person formulated plans and carried them through, or
>> is his conduct impulsive; (3) does his conduct show leadership,
>> or does it show that he is led around by others; (4) is his conduct
>> in response to external stimuli rational and appropriate,
>> regardless of whether it is socially acceptable; (5) does he
>> respond coherently, rationally, and on point to oral or written
>> questions, or do his responses wander from subject to subject;
>> (6) can the person hide facts or lie effectively in his own or
>> others' interests; and (7) putting aside any heinousness or
>> gruesomeness surrounding the capital offense, did the
>> commission of that offense require forethought, planning, and
>> complex execution of purpose? Briseno, at 8-9.
>
> However, applicant provides no evidence in the form of medical records,
> affidavits, or expert testimony to address any of the factors outlined in Briseno.

*Ex parte Elizalde,* 2006 WL 235036, *3 (Tex.Crim.App.)(not designated for publication).

42

Appellant had *none* of the guidance of *Briseno* to assist him at trial.

In Peggy M. Tobolowsky, *Texas and the Mentally Retarded Capital Offender*, 30 T.

Marshall L. Rev. 39, 115-16 (Fall 2004), the author explained the approach this Court

evidenced after *Atkins*:

> The Texas Court's appellate review of the first few Atkins claims asserted in
> habeas corpus and direct appeal proceedings reflected its stated deferential
> approach. In the *Briseno* subsequent writ case, the Texas Court denied relief
> based on its adoption of the convicting court's factual findings concerning the
> absence of mental retardation and its independent review of them. In the
> evidentiary hearing in this case, the convicting court had considered evidence
> of the applicant's IQ scores ranging between sixty-seven and eighty-eight, with
> the most accurate scores of seventy-two and seventy-four; testimony about his
> childhood, juvenile delinquency and prison experiences, and substance abuse
> in connection with his adaptive functioning; and conflicting assessments of
> mental retardation from the defense and State experts. The Texas Court
> concluded that although there was expert testimony supporting a finding of
> mental retardation, there was also lay, expert, and documentary evidence
> supporting the convicting court's conclusion that Briseno failed to prove his
> mental retardation. Deferring to the convicting court's credibility
> determinations, finding ample evidence in the record to support this factual
> finding, and based on its own review, the Texas Court denied relief on
> Briseno's Atkins claim.

What is significant is the reliance upon lay and documentary evidence to which

Appellant was unaware necessary to properly present his claim of mental retardation.

Defense counsel was left completely in the lurch regarding what was necessary in order to

prove a mental retardation claim. And what is especially significant, is the trial court had a

remedy – the motion for continuance could have been granted. Defense counsel asked for

a reasonable length of time to study *Briseno* and gather the evidence this Court stated was

necessary to meet a mental retardation claim. The trial court's refusal of this most reasonable

of requests violated Appellant's right to a fair trial.